Hear ye, hear ye, this Honorable Appellate Court for the 2nd Judicial District is now back in session. The Honorable Susan F. Hutchinson, residing. Good morning and please be seated. Your Honor, the second case on the docket this morning is 2-23-0096, George Street Acquisitions, LLC, et al., plaintiffs' counter plaintiffs' appellates, Parikh Family Companies, et al., defendants' counter plaintiffs' appellees. Arguing on behalf of McCallum, Mr. Patrick Plyer. Arguing on behalf of the appellees, Ms. Carrie A. Collins. Okay. All right. Good morning again. And when you are ready, Mr. Plyer, you may proceed. Thank you. May it please the Court, my name is Patrick Plyer and I represent the appellants in this case, George Street Acquisitions, LLC, Mark Ryder, and 5MRE, Inc. This case tests the outer boundaries of permissible conduct in a real estate transaction and provides this Court with three opportunities. First, to declare that bad faith has no place in contracts in Illinois. Second, to illuminate what it truly means to be prevented from moving forward with a contract. And three, to enforce a confidentiality provision pursuant to its plain meaning. I have just a preliminary question. When in these proceedings, the acquisition, the negotiations, whatever you want to call them, when was Mr. Ryder, when did he identify himself as a member of the George Street group? Was it, what, where in time, on a timeline? So that happened going way back. It happened in the August time period. That was the time period, Justice Hutchinson, when my client, Mr. Ryder, actually had another party that was trying to buy the properties. But he was a broker at that point. Correct, for Mr. Reck. Okay. And Mr. Reck did not want to buy just one property, and that's when Mr. Parikh, KP, said that, I want to sell everything, and that's when Mr. Ryder said that it was him and his brother that were going to move forward with the transaction. Okay. And that's one thing that I agree with Judge Christensen on, that it was clear from the get-go that Mr. Ryder was one of the purchasers from the transaction. That's not an issue. So it was before October 2018, which is when the original agreement actually is starting to circulate. That's correct. Okay. And with respect to the bad faith argument and declaring, giving this Court an opportunity to declare that that faith has no place in a contract, Illinois recognizes that where a party has broad discretion and wields it in a way that is arbitrary and inconsistent with the party's expectations, a cause of action for breach of the implied covenant of good faith and fair dealing exists. And that's precisely this case. This is a case where there is broad discretion. And how does that come about? Well, on October 5th, like we were just talking about, is when the contract first was issued. And before that, it was originally drafted as an asset deal and it became an equity deal. There's no question about that. Let me ask a question as long as you're there. Whose decision was this to go from acquisition to equity? Yes, Justice Hutchinson, that decision was made by the sellers. They were going to reap $6 million in tax benefits by changing it to an equity structure. So we did that to the benefit, my clients did that to the benefit of the sellers. And if you look at the contract, it really looks like an asset deal. But Section 1.1H is where we know that it's an equity deal for two reasons. One, within the due diligence period, the sellers were able to change the corporate structure for their tax benefit. And second, their tax attorney attached a preliminary plan for information purposes of a draft outline to consummate that equity structure. So it was for information purposes and it was a preliminary draft. It wasn't yet final. Within the due diligence period, it needed to be made final. But then on February 14th, Box sent a revised amendment which struck out the provision for personal indemnity, right? It informed that the revised amendment is what the defendants would agree to. So you continue to seek an amendment that included personal indemnity. Doesn't the failure of the defendants to respond or grant extension in light of the fact that plaintiffs weren't accepting that without personal indemnity? I mean, the basis was changed at several times and the plaintiffs continued to seek an amendment, correct? My client's amendment was necessary for all parties' benefit. But you never heard anything back from the defendants? After the February 14th. That's not correct. I disagree. On February 15th, before we even had a chance to respond, the seller sent another amendment. And that's the problematic amendment in this case. And, in fact, I will make things simple. There are two egregious instances that constitute bad faith here. And one is that February 15th amendment. It included individual signature lines for two of the principles of the sellers. And it was determined at trial from multiple witnesses that they would never sign that. They sent us an amendment that needed to be completed. Now, we can put aside indemnity. Let's say they strike out all the indemnity and that's what they want to sign. That last amendment that they sent us an execution copy of, they would never sign. But was that meant to be signed or was that an error sent that way? They never told us it was an error. In fact, it misdirected us such that on February 18th, my clients think we're getting close because those lines are put back in. The bottom line is that in this contract, the last amendment that they sent us to sign was one that they would never sign. At that point, had you told your lenders that it was an equity deal? Yes. When did you tell or when did, you know, the parties let the lenders in on the fact that this was an equity deal? Just this moment. It was in early January. I think there was, in the record you'll see that there was. So that was, was it after your first extension? No. That was right about the time of that first extension when finally not just the deal makers, the lawyers got involved and we were hashing out the structure of the deal in that January time period to finalize what it would look like. And the schedules that the sellers proposed in late December when the contracts were split, those schedules had a structure by which multiple entities would be selling to my clients. My clients and the lenders simplified that so that one entity on the seller side would sell to my clients. And that was a simple structure that actually saved them money. And the sellers agreed to that in January. So everybody was on the same page. All that needed to happen was an amendment needed to be finalized and solidified. For personal indemnity. Is that the amendment you're referring to? Or is the amendment the extension of the due diligence period? No, Justice Malone. The amendment I'm referring to did three things. One of them, it asked for personal indemnity. Number two, it asked for the inclusion of a seller that was not included in the original contract to be under oversight. And as Mr. Ross conceded on cross-examination, it was necessary for that amendment to include that information. And then the third thing that it did was finally make that structure part of the contract. Because before that, it was a preliminary draft for information purposes only. It needed to be made final. They needed it too. Now, the indemnity issue, if they said, hey, we don't want it, that would have been great. Then we could move forward. We could chart a path. But there is not a single, and I know the record's large, but there is not a single shred of evidence, not a single piece of paper in the entire record that says indemnity is dead on arrival. We would never agree to it. Didn't Bach testify? Didn't Mr. Bach testify that early on he had told the buyers they would not be, they would not accept that? And if my memory is correct, you brought it up more earnest and well, you know, well into the process, maybe at or after the time of the first extension. Oh, by the way, we're going to need this. I don't know if it was communicated, our lenders need this. Maybe it was. You know, I'm open to that. But the bottom line is, as I understood the testimony from the trial, Jim Bach said they won't have it, and then he repeatedly said it, they won't do it, they won't do it, they won't do it. And yes, but yes, you're right, there was that draft of the document that contains their signature lines as, I guess, indemnitores. That is true. That amendment happened, and if we look at Mr. Bach's case. It is, but I guess my real question is, did Bach testify? I had told the buyers early on they won't do personal indemnity. I think if we look at his actual testimony, what he began to say was that I told him that I would not agree to indemnity, and I struck it out early in the deal. And when we look at the actual writing of what he struck out, it's kind of interesting, actually. It was a vestige of the asset deal, and it was a damage limitation provision that prohibited my clients from seeking personal liability from the sellers, and he struck it out. So our position is he left it on the table. Now, in his mind, he might have thought that, but when we actually look at what he struck out, he didn't strike out personal indemnity, because at that time, when the contract was being prepared, it was an asset deal, and people weren't talking about indemnity. The contract was changed to an equity deal at the last minute to accommodate the sellers, and the only thing that we see that shows that was the 1.1H. And the bad faith comes in when we give that amendment that they would never sign, because how do we move forward then? And then the second issue is on February 19th, which is the last day of due diligence. Now, we were waiting for, we were trying to get a response from the other side, and on the 19th, the last day of diligence, they tell us that we need to take our request up with Jim, I'm sorry, Don Russ, a different attorney who had not handled any extensions. And at that point in time, we're running out of time, and Mr. Bach at that point knows that his clients are not going to agree to the extension. If that's not bad faith, I don't know what is. It's not petty. It's not immaterial. If we look at the examples of bad faith, prohibiting one side or not cooperating with one side, imperfect performance, interference or failure to cooperate in another party's performance, that's exactly what happened. This wasn't petty. This was running out the clock, and Illinois can't allow contracting parties where there's discretion in a contract to let that happen. It's bad for business, and things can't go forward. Weren't all of the other extensions agreed to prior to the lapse of the due diligence period? This request was made after the lapse of the due diligence period, was it not? No, Justice Shostak. The due diligence period had been extended because Jim Bach was pulling his hair out, and it had been extended to February 19th. Ten days of that period had lapsed, and in that period, my clients are saying, what's going on? Time is of the essence, but no one's responding to us. So finally on February 14th, my client said, hey, we need an extension because you're dragging your feet here, and they don't respond to that request. On the 15th, 16th, 17th, or 18th, and we renew it, and then finally on the 19th, the last day, instead of saying yes or no, they send us on a wild goose chase. No one in their right mind is going to put down $1.35 million in earnest money when you can't even get a response to someone who's supposed to be operating in good faith. All right. So now when we get to the end here and, you know, the earnest money isn't put down, there is a meeting of your parties, Equitross, Castle Rock, or their principals and your clients. Okay, okay, we can do it without the amendment. Why didn't that discussion happen earlier? Because the amendment was something that was contemplated. When we have a preliminary draft of a schedule, we're not contemplating, like, an all-hands-on-deck call to get this thing patched together. We're supposed to be working in good faith to finalize a structure and make it part of the contract. So if they had told us early on, you know, as Justice, I think Shostak alluded to, that indemnity and Justice Mueller, that maybe they wouldn't agree to indemnity, if you say clearly not having us read your mind that we're never agreeing to it, fine, then we move on. But at that point in time, we hadn't gotten any response from them, and the last amendment we received from them that they said they would sign off on, they never would. That's what we're left with. So it was bad faith. And in terms of specific performance, I wanted to just mention on the specific performance angle, this is truly a case where we are prevented from moving forward. Why? And I'll make it simple. We have an amendment that no one's going to sign. How can we move forward? We are prevented. I mean, it's black letter. I mean, to me it's clear as day, but I'm trying to convince you all that, you know, we can't move forward without that amendment. So you weren't going to get the financing without that amendment? Well, I disagree. I think after the fact, we knew that we could. We wanted the amendment because it helped all parties. It solidified the structure, that formula that allowed the sellers to receive the tax savings, but we just didn't have a direction. We didn't have an answer. They prevented us from moving forward. And as Mr. Russ admitted on Cross, the amendment was necessary also to add that additional parcel. Justices, I don't know if my time is up. You'll hear the buzzer. I'll hear the buzzer. The kitchen buzzer over there. I was thinking about bringing my own. We don't have a red light. Okay. So we were prevented from moving forward on those two bases. Additionally, even if you do not believe that we did prove specific performance, monetary damages and lost rent is appropriate here, we were precluded from presenting evidence at trial, but we made an offer of proof. And the basis was that, and this is an open question in Illinois that really hasn't been answered, is that if you do engage in bad faith, can you rely on a damage limitation to prevent someone from seeking their remedy? Kitchen buzzer. But you can finish your thought. Thank you. For the reasons stated here today, I ask that you reverse the trial court's judgment against my clients and enter judgment in their favor and against the appellee's confidentiality claim. Thank you. I have one other question. You know, you're stating in your briefs that you were ready, willing, and able to proceed here, but how can you argue that you were ready, willing, and able when you were seeking an amendment to finalize financing three months after the contractor signed? Because this is an equity transaction. This isn't like buying a house. My clients are buying businesses, and that structure is what the lenders need to finalize the loan documents. Even if you gave us something that said no indemnity, we'll sign off on this, we're ready to go. But this is a different transaction. This is an equity transaction. The businesses that are at stake are important, and we needed to finalize that amendment. Was the equity partner ever identified in the agreement? The equity partner was Castle Rock, and there was a blank in there, but if we look at the end of that operating agreement, it's supposed to be an entity that's going to be set up by Sebastian Barsh. There are obligations in that agreement that force him to deposit the additional earnest money, and his group had already put up the $100,000 to let us extend the diligence period once. Just this one. Would you agree that the deal was a joint obligation of both 5M and George Street? 5M was involved in the deal on the broker side. They both signed it, right? 5M was the broker on the deal, and George Street Acquisitions was the purchaser. So in that respect, I think everyone was working collaboratively. And they both signed the same contract? Yes. And so in that sense, maybe it could be considered a joint obligation? I think that they had different roles underneath the contract. With respect to the non-disclosure? With respect to the non-disclosure agreement, I think that on that point, Mr. Ryder, when he was sending out e-mails to get financing, he was operating as a purchaser. I think we've all, not everyone, but maybe a lot of us have purchased a house. I don't know that my real estate agent is going out to Hawking and Banks. That's my job, and that's what a purchaser does, and that's what he was doing. And that's why we've argued that the only relief that the sellers are entitled to is injunctive, and if not injunctive, at least the plain language says half of the 25. I guess my question is, if it's a joint obligation, then the rule in Illinois is they're joint and severally liable. If they're joint and severally liable, then I'm not sure it would be error for Judge Christensen to then say that the broker limitation of damages provision would then kick in and thus avoid the issue that you've raised. Let me just finish, counsel. That only injunctive relief would have been allowed. And then finally, if George Street had breached the contract, then how could they use that clause in the liquidated damages provision to benefit themselves? Do you follow my I'll-call-it logic? I do. I do follow it. And the reason— Any thoughts on that? I do. I do not think that the obligations are joint. I think they've signed in different capacities. One is the purchaser, and 5M is who holds the brokerage license. I think there are situations when a broker could do something like publicizing for a different side, and that could harm everyone because everyone had a duty of confidentiality under this agreement where this isn't being publicized out in the world, and that might hurt both sides. I understand that there's only one broker, so the way that actually plays out with the 12 going to one side and 12 going to the other side is a little bit awkward. But if Mr. Ryder is out publicizing something and disclosing information, it could also hurt the George Street side of the house. So I don't think it was— I mean, in truth, where Ryder was the principal of both George Street and 5M, true? That is true. Thank you. Okay, thank you. You'll have an opportunity for a reply after the council is finished, if you choose. All right, Ms. Conlin. May it please the Court. Let me start with the specific performance piece of this. The Court followed the law and determined that the plaintiffs had failed to provide clear and convincing evidence that they were entitled to specific performance. Well, didn't the Castle Rock representative—and there are too many names here for me to remember them— but didn't he say, we had the money? We had the $63.5 million or something like that? So actually, Your Honor, and I actually pulled this, so I'm prepared to go through actually what Mr. Barsh said. So actually, Mr. Barsh at trial testified that he had no obligation to pay the monies, that he could choose whether or not he wished to do so, and further that he was not comfortable depositing the earnest money because he wasn't sure this deal would close and he didn't want to lose the money. So there's no agreement for Mr. Barsh to pay, and in fact, Mr. Barsh actually testified that he would have to get the money from other people, and those people had no contract to provide the money. So we essentially have a situation here where there are buyers that have no money, they have no one that agreed to give them money, and they're trying to close on a $75 million equity transaction. And so that's why this deal failed. There was no money. I mean, you know, George Street had no assets. It was formed just for this deal. Five items of brokerage and Mr. Ryder, and there was zero evidence at trial that any of those entities had in a bank account or in their possession in any way these funds. Likewise, there was nothing from the lender indicating it was ever going to pay the earnest money. So we don't even get to the point really of what was due at the closing, because first, I mean, a key element of this contract was the earnest money, $1.5 million. And that's because we're talking about a $75 million deal of six apartment complexes. So what you're saying makes a lot of sense. So doesn't your lack of response to the repeated request for extension show bad faith? Absolutely not, Your Honor. But, you know, wouldn't it have been more reasonable and expected to just deny the request so that the plaintiffs would have had more time to determine, you know, whether to move forward on the contract? So here's the thing. Those extensions, we're talking about a due diligence period, okay? And due diligence is for the buyer to decide if they want to go ahead with the deal. And if they don't want to go ahead with the deal by the conclusion of due diligence, they can terminate the deal and get their earnest money back. Here, at the end of the due diligence period, they had deposited $150,000, okay? So they never said at trial, we were waiting for A, B, or C to decide if we wanted to do this deal. And that's why we need to extend the due diligence period. They didn't need anything. They were using this due diligence period as a way to kick out when they had to pay the earnest money, because they knew the earnest money was due at the conclusion of the due diligence period. So that's why they exercised their right and paid $100,000 to do so to kick the date out 30 days. But doesn't the point of a due diligence period is, isn't it to allow the plaintiffs time to investigate the properties and determine whether they still wanted to move forward with the contract? A hundred percent. And that's why they always wanted to. And they'll tell you, they wanted to move ahead with the contract. Their only glitch was they didn't have the money. The only reason they kept extending due diligence, they could have paid this. And so I want to go back real quickly. What was the money due? Was it due within a reasonable time after the due diligence period? No, Your Honor. It specifically says in Section 1.3 that the earnest money was due. Two days after the contract was signed. No, Your Honor, it doesn't say. But that's when it came, didn't it? No, it never came. Are we talking about the final earnest money? The earnest money, the extra $100,000 earned. Oh, that earnest money? That, correct. Absolutely. So there's two payments they actually made. Right. First they paid $50,000 shortly after the contract was executed. Then they wanted to extend out this due diligence period because they wanted more time to try to get somebody to give them the money of the $1.5 million. So they paid $100,000 to do that, and they paid it in two days. You're absolutely right. So then this last payment of the balance of $1.35 million, the huge thing, of course, that was due at the satisfactory conclusion of the due diligence period. So it doesn't say two business days. No, but wouldn't it be reasonable to think that that was due a reasonable time after due diligence period since the other payments were made a reasonable time after the due diligence period? Well, the contract would have said that. The contract says it doesn't say two business days. If the parties agreed to do two business days, they would have said that. And I think what Judge Christensen did was follow what the contract said. This was an agreement these parties made, and they chose to use upon satisfaction of the conclusion of the due diligence period, which everyone agrees that the due diligence period ended February 19th. So, and their actions show that they knew it was this date. That's why they're scrambling around and sending us a letter on February 19th saying, if you don't give us more extensions, we reserve our right to terminate and get our money back. We have to have the extensions. Why do you need the extensions if you have the money? And they also wanted an extension for financing, because not only did they not have the earnest money, but they didn't have financing in place in the contract. But you didn't respond to the request for an extension. So, in terms of that last extension, okay, this was, and Judge Christensen specifically addressed this in her ruling, in her order. There is nothing under Illinois law that says that if an attorney does not respond to a request for an extension in a contract, that then means that the contract is amended and the extension is granted, or that that attorney has engaged in bad faith. Wouldn't it have just been more reasonable and expected to just deny the request so that the plaintiffs would have more time to determine how are they going to move forward on this contract? Well, Your Honor, respectfully, they had, they knew they owed us money when they entered into the contract on October 5th and they agreed to pay it. Agreed. And so, it's a setup. In my mind, it's a setup. Because they don't have the money. They already got the extension they're allowed under the contract. They already got one extension from us. They've already sent us an amendment on January 31 that made a lot of changes. It wasn't just personal indemnity. They wanted to have the right to continue the closing. They wanted to set specific prices for each of the properties. There was 14 different items in there. We rejected that. We then, and then they sent us another one, and I looked at it, and it's basically the exact same thing but for a couple additions and one little section marked out. We then sent them an agreement and said, this is our proposal. We'll sign this. They didn't agree to it. It wasn't signed when it got sent. Correct. It was not signed. It was in a red line. It was not sent. Correct. Then on February 15th, we send a follow-up. It's got a few changes. They didn't accept that. They not only didn't accept it, they specifically rejected it on the 18th. They would not sign the amendment that we agreed to sign. Had they signed it and told Mr. Bach, yes, we're agreeable. Here's our signature, it would have been resolved. The court saw through this whole issue about, oh, there was a red line. There was obviously an error by counsel by sending a red line that contained an old provision. No one thought that was true because if they thought it was true, the other side would have signed it. Oh, my gosh. Now, all of a sudden, the sellers are getting this personal indemnification. Let's sign this and send it right back to them. That's what you would do if you thought that was legitimate. That's not what happened. They rejected it because they knew that that was not part of the deal. The other side cannot enter into a contract, agree to the terms, and then claim that it's bad faith for us to not amend the contract. The contract says an amendment can only occur if both sides agree and both sides sign off. And here, they're asking for things that if they needed those things, they should have been in the original contract. They weren't. And, in fact, they didn't raise these items until January when we're talking about an October contract. So they're scrambling to change the deal. We agreed to their approved structure. But one of the major changes was it went from asset acquisition to equity acquisition, and that didn't happen until pretty late in the proceedings, did it? Respectfully, Your Honor, that didn't happen. There's one contract. What counsel was talking about are drafts of a deal that never happened. There's one deal here, and that didn't happen until October 5th. And that deal is an equity transaction, and we could have closed on that deal without any amendment. And there was no testimony to the contrary. We could have closed. They decided not to comply with the deal, and so that's why it didn't close. I mean, there was no asset. I see how counsel says, well, there was a deal, and apparently their definition of a deal is when you're talking about things in negotiation, that's a deal. That's not a deal. But they were ready to move forward without the amendment, correct? My clients were absolutely ready to move forward without the amendment. They didn't need the amendment. The deal could have closed. But weren't the plaintiffs ready? At that point when they learned there would be no extension and no agreement on the amendment? They were absolutely not ready. They didn't have the earnest money. How can you be ready to pay an amount that you don't have? You can want to do it all you want, but you have to have the money. I mean, you're not able, certainly not able, but I don't even see how you're ready if you don't have the money and you're not willing because you don't have the money. It all comes down to the money. We never prevented them from depositing this money. They never tried to deposit it with the expiration and it was rejected. Again, there was no substantiation provided by them that they had the money, from Sebastian Barsh or anybody else. And I think that Judge Christensen's order explains in a lot of detail, in my view, 34 pages of how she came to her conclusions. And she also provided basically a 34-page findings of fact. And I don't think that the affluence has shown that Judge Christensen abused her discretion in denying specific performance. I don't think that they have shown that her decision to deny their request under the duty of good faith and fair dealing was against the manifest weight of the evidence, nor was her ruling as to the confidentiality. Now, if we look at the contract, there was no discretion of my clients. There isn't. If you look at the provision, they say it's in Section 1.H of the contract. It simply gives my clients the option to change the names of the owners of the annotations. Okay. I've already confused the lenders with who was going to give the 63 and who was going to give the 12. Hopefully, I'll get this one straight. When was Perique Holding LLC or Perique Investments LLC actually formed? When were they? They would have been formed prior to closing, but they're not formed. But if that contract could have been done right after it was signed in October, these entities weren't alive yet, correct? But the contract said, well, no, the schedules to the contracts reflect that change. So the entities, and Mr. Ross testified about this at trial, the name change would have occurred before the closing. But first, we had to get through, because title, nothing was going to happen in this deal until they paid that earnest money. Once they paid the earnest money, we would have ordered title. We would have gotten all of this stuff squared away. But the contract set up such that we don't have to start incurring all those costs until they tell us we really have a deal. And so in terms of, so there wasn't, in order to have a claim for the breach of good faith and fair dealing, you have to have broad discretion under the contract, and you abuse your discretion when you're exercising that discretion. And here, they're trying to say that somehow that we have broad discretion to extend deadlines. We don't. We couldn't shorten a deadline. We couldn't say, oh, now we want you to pay the earnest money on February 1st instead of the 19th. We couldn't do that. We couldn't extend it. We couldn't modify it. We couldn't change any of these dates unless under the contract, both parties agreed to amend the contract, and, you know, that was then part of the deal. Well, they would agree to extending the due diligence period, wouldn't they? My clients? No, the plaintiffs. Well, the due diligence period is for their benefit, and they wanted to extend it yet again to try to get the earnest money. Correct, but they got no response. They got no response, but that's just because you make a request, Your Honor, doesn't mean that you then extend days out. I call my mortgage company. Can I pay my mortgage late? I don't hear back. Does that mean I just don't pay it or I'm totally fine? That's what they're trying to say. We tried to call an attorney. He didn't get back to us when we wanted him to get back to us, so now we didn't have to pay it. But that's just not what they asked, and they did not get a response. They asked, why didn't they get a response until the end of the period when it was deals off? Well, so it wasn't much before the plaintiffs. Right, and so they asked for another extension. Mr. Ross testified he was traveling, he was at these corporate meetings, what have you. Yes, he didn't get back to them. But that in and of itself, because if that is the law, which there wasn't any law presented on this, this would be new law, and this would subject every attorney, if they don't get back to another party about a favor. And this was a favor, so we didn't have to do it. Nothing in the contract says we have to respond to a request by a certain number of days, that we have to give more extensions. That's not what this says. And so that would mean then that every attorney that doesn't return a call asking for a favor will result in the contract being amended and their client being liable for bad faith. That's not what the law is in Illinois. Well, was Mr. Ross a private practitioner, or was he a member of a firm? He's a member of a firm. I mean, as we do it here, if somebody can't come, we look at the list of the firm members and say, okay, we've set this date for you. Somebody be responsible for this case in my absence. Couldn't that have been done so somebody could have taken care of this? Well, so again, I think we're going outside of is it polite to return calls? Absolutely. Is it required under the law, and does your client then, is your client then liable for bad faith and the contract's amended? No. So should you return calls? Absolutely. Did that happen? No. When you don't hear back from someone, I assume it's no, personally. I don't assume, okay, I didn't hear back from you, so now I'm just not going to pay. I don't think that's reasonable. And Judge Christensen did not find it reasonable, and she discussed this point of how not returning a call for a fever that's not required in the contract doesn't have any effect. Okay. Thank you. Thank you. One further question. We didn't touch on liquidated damages at all with you. Yes. Ryder testified that he was seeking lenders in his role as a buyer, not as the broker. The trial court granted liquidated damages based on Ryder not obtaining a nondisclosure agreement before giving confidential information to lenders. Correct. How do you reconcile the trial court's ruling with Section 2.2 of the contract, which grants liquidated damages for broker violations, not for buyer's violations? Well, because Mr. Ryder chose to wear two hats in this deal. That was his choice, right? So when is he acting on the buyer? When is he acting on the broker? He's acting on both because he's doing everything for both. And so when he knew he was supposed to get NDAs, and he knew that because that's why he asked Mr. Barsh after the fact to predate an NDA to submit in this litigation so that he could show that he got an NDA. So you can't both be breaching the agreement wearing one hat and recovering under the same agreement wearing another hat. So the court correctly gave the liquidated damages to my client because that was done both as the broker and the buyer, and they cannot recover for their own breach, which is what they would be doing if they got the monies from the broker, which would basically be moving money from one pocket to another. Anything else, Mary? No. Okay. Thank you very much. All right, Mr. Kleiter, you may proceed. Thank you. And just so everyone is not confused, I was asking about an administrative matter that appears on a sheet that I may have had to grant a motion or deny a motion, and I couldn't figure out what it was. So that's why I asked Mr. Kaplan to join me here. Okay. It had nothing to do with the actual arguments. Thank you, Justice. I'd like to start at where Ms. Conlon left off. This isn't a matter of not getting back to someone or giving a courtesy. This is a matter of not only professional responsibility but good faith under the contract. This isn't the last day that someone was busy and we couldn't get a hold of them. That last extended due diligence period, we have been trying to get a hold of the other side for 10 days, and we asked for an extension on the 14th. On the 15th, 16th, 17th, and 18th, nothing. On the 18th, we asked again, and this isn't just a matter of Mr. Russ not responding to us. Mr. Bach, who handled the prior extensions, he's the one who told us to go talk to Mr. Russ. Mr. Bach could have said no, but instead we got no answer. Mr. Russ's secretary was doing her best to get a hold of him and sent an email saying that this was urgent, but we got no response. Well, there had been communications between and among the parties outside of the attorneys, and while that shouldn't necessarily happen once everybody is represented, was there any effort to contact the KP or the other gentleman who was involved in this as kind of the broad representatives of the family? And I don't have the record set, but Mr. Ryder testified to that. I think he said it was a frantic day. They were trying to reach everyone. I think even Mr. Bach, someone came to his house and he thought that was offensive, but then he quickly realized that his house is also his office address. So it wasn't just trying to reach Mr. Russ. We were trying to reach multiple people, and Mr. Russ, despite his busyness, had the audacity to build time on this file for the billing records we got on that day, but he couldn't get back to us. Now, Ms. Conlin said, well, you should have just signed it. My clients didn't need an amendment, but Mr. Russ, Ms. Conlin's partner, he testified in cross-examination that an amendment would be necessary because of this missing parcel. So it's completely incorrect that no amendment was necessary. Some amendment was necessary. And I ask, what were we to sign? The amendment that they sent us, it wasn't just a red line. It was also an execution copy, and that execution copy was one that the defendants testified they never signed. So we were left with nothing. We were prevented from moving forward. In terms of the contract language that Ms. Conlin mentioned, and I'm paraphrasing, because I can't quote exactly what she said, but what I was hearing was that the earnest money was due upon the conclusion of the due diligence period, something along those lines. But if you actually look at the contract. She said the contract didn't say within a reasonable time thereafter, correct? That is correct. And where I'm going with this, it also doesn't say that to deposit the money upon the successful conclusion of the due diligence period. What it says is, upon purchaser's satisfactory conclusion of the due diligence period, purchaser shall deposit. So it needs to, just logic, accounting background, black and white, something needs to end and then something needs to happen. So it doesn't say simultaneous. It doesn't say in the same day. And I agree with Judge Christensen that the term upon is ambiguous, and that's why we cited and referred to the red lines where we had a finite 90-day, a finite 60-day, and then we're left with this. And I think that the only reasonable interpretation is that it was two days. But, again, we still have the bad faith in the prevention element because what were we to sign? There was nothing at that point because we couldn't get an answer from the other side. Could you get the money? Would you have the money at that point? I think, yes. In our opening brief, we quoted the testimony from Mr. Barsh. I think that was unequivocal that, but for this confusion, the money would have been there. His group already put up $100,000. Well, that was a far cry from what he had put up. I agree. But there was a communication, I think it was as early as, and it's on the record, it's Exhibit 951E951 of the record, where he's e-mailing his partners, getting their ducks in a row to have the money ready to deposit. And the all-hands-on-deck call further illustrates the desire of everyone to move forward with this deal. This isn't like some of the cases where somebody has like some kind of a suspect plan or an uncle in another state that's going to throw some money down on this deal. We had major lenders who testified at trial that this was a deal that they were wanting to push forward, had never seen a deal get as far as this one and not go forward. There were no red flags. And the Penson lender, Ray Clement, commented at trial about how impressed he was with Mr. Barsh's group and their deep pockets. Now, I like Judge Christensen a lot, and she said nice things about me in front of my children, which I appreciate. But I do think the discretion was abused here. I mean, put simply, we could not, we were prevented from moving forward. So for those reasons, Justices, I ask that you reverse the trial court's judgment. Thank you. Well, if there was a conflict in the evidence as to when the additional earnest money was due, doesn't that become an issue of fact for the trier of fact? Because there was ambiguity, the extrinsic evidence needs to be weighed, and that is an issue for the trier of fact. The abuse of discretion comes in given that. We had a finite period, 60-90, and then we come to a reasonable time period. Oh, I'm sorry. Okay. Justice Malone? Okay. Thank you. Thank you very much. Again, thank you both for your. No motions on this case? What? No motions that were on this case? No. Apparently not. I think I've got a case, but we'll look. We're still discussing an administrative matter that may or may not. Well, I'll ask. Does anybody have a motion outstanding in this case right now that has not been ruled upon? No. I didn't think so, but this note is confusing to me. So thank you very much for your participation this morning. This is our second rather significantly complicated case of the day, and we do appreciate the detail that you have both extended in this argument. We will make a decision in this matter in due course. We're now going to stand in recess to prepare for our next case of the morning.